IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | No. 3:08-CR-153-L |
| | § | |
| ERIC RULACK FARRINGTON JR. (1) | § | |
| JANICE LITTLE SHEPHERD (2) | § | |
| REJIS LAMONT WILLIAMS (3) | § | |
| KEVIN RAY SANDERSON (4) | § | |
| JAMES EDWARD JONES (6) | § | |
| EDWIN TERRENCE BELL (7) | § | |
| MICHEAL LEWIS ANDREWS (9) | § | |
| ROBERT JOHN MASON (10) | § | |

## MEMORANDUM OPINION AND ORDER

Before the court are: (1) Defendant Robert John Mason's Motion for a Judgment of Acquittal

After the Prosecution has Rested its Case in Chief, filed March 24, 2010; (2) Defendant Edwin

Terrence Bell's Motion for Post-Verdict Judgment of Acquittal, filed April 9, 2010; (3) Defendant

James Edward Jones's Motion for Post-Verdict Judgment of Acquittal, filed April 12, 2010; (4)

Defendant Kevin Ray Sanderson's Request for Ruling on Motion for Acquittal Pursuant to Rule 29

Following the Close of the Government's Evidence, Motion for Acquittal Pursuant to Rule 29

Following Jury Verdict, and Motion for New Trial Pursuant to Rule 33, filed April 13, 2010; (5)

Defendant Janice Shepherd's Request for Ruling on Motion for Acquittal Pursuant to Rule 29

Following the Close of the Government's Evidence, Motion for Acquittal Pursuant to Rule 29

Following Jury Verdict, and Motion for New Trial Pursuant to Rule 33, filed April 13, 2010; (6)

Defendant Rejis Lamont Williams's Motion for Post-Verdict Judgment of Acquittal, filed April 13,

2010; (7) Defendant Rejis Lamont Williams's Motion for Post-Verdict Judgment of Acquittal, filed

April 15, 2010; and (8) Defendant Robert John Mason's Motion for Post-Verdict Judgment of Acquittal and Alternative Motion for New Trial, filed April 19, 2010. Also pending are the oral motions for acquittal made by all Defendants after the government rested its case on March 23, 2010. Defendant Eric Rulack Farrington filed a memorandum in support of his oral motion on May 12, 2010.

After carefully considering the motions, briefs, record, and applicable law, the court **denies** Defendant Robert John Mason's Motion for a Judgment of Acquittal After the Prosecution has Rested its Case in Chief; **denies** Defendant Edwin Terrence Bell's Motion for Post-Verdict Judgment of Acquittal; **denies** Defendant James Edward Jones's Motion for Post-Verdict Judgment of Acquittal; **grants** Defendant Kevin Ray Sanderson's Request for Ruling on Motion for Acquittal Pursuant to Rule 29 Following the Close of the Government's Evidence to the extent it rules on the motion and **denies** his Motion for Acquittal Pursuant to Rule 29 Following the Close of the Government's Evidence, Motion for Acquittal Pursuant to Rule 29 Following Jury Verdict, and Motion for New Trial Pursuant to Rule 33; **grants** Defendant Janice Shepherd's Request for Ruling on Motion for Acquittal Pursuant to Rule 29 Following the Close of the Government's Evidence to the extent it rules on the motion and **denies** her Motion for Acquittal Pursuant to Rule 29 Following the Close of the Government's Evidence, Motion for Acquittal Pursuant to Rule 29 Following Jury Verdict, and Motion for New Trial Pursuant to Rule 33; **denies** Defendant Rejis Lamont Williams's Motion for Post-Verdict Judgment of Acquittal; **denies as moot** Defendant Rejis Lamont Williams's Motion for Post-Verdict Judgment of Acquittal; and **denies** Defendant Robert John Mason's Motion for Post-Verdict Judgment of Acquittal and Alternative Motion for New Trial. The court **denies** the oral motions for acquittal made on March 23, 2010.

## I.      Factual and Procedural Background

The grand jury returned a superseding indictment in this case on January 20, 2010 (the "Indictment").   Defendants Eric Rulack Farrington Jr. ("Farrington"), Janice Little Shepherd ("Shepherd"), Rejis Lamont Williams ("Williams"), Kevin Ray Sanderson ("Sanderson"), Tony Earl Anderson ("Anderson"), James Edward Jones ("Jones"), Edwin Terrence Bell ("Bell"), Marcus Allen Parker ("Parker"), Micheal [sic] Lewis Andrews ("Andrews"), and Robert John Mason ("Mason") were indicted on various charges.[1]

All Defendants were indicted on count one, conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349.  Farrington, Williams, and Sanderson were indicted on count two, bank fraud and aiding and abetting, in violation of 18 U.S.C. §§ 1344 and 2.

Counts three through seventeen alleged wire fraud and aiding and abetting, in violation of 18 U.S.C. §§ 1343 and 2.  Farrington was charged with this offense in counts three through seventeen. Shepherd was charged with this offense in counts three through fifteen.  Williams was charged with this offense in counts three through eleven.  Sanderson was charged with this offense in counts three, four, ten, eleven, and fifteen through seventeen.  Jones was charged with this offense in counts five through eleven, fourteen, sixteen, and seventeen.  Bell was charged with this offense in counts five through seven, ten, and eleven.   Andrews was charged with this offense in counts sixteen and seventeen.  Mason was charged with this offense in counts fourteen and fifteen.

---

[1]The counts against Anderson were dismissed without prejudice on February 1, 2010.  Another individual, Christopher Williams, was named as a defendant in the original Indictment, and the counts against him were also dismissed without prejudice on February 1, 2010.  Parker pleaded guilty to count one, conspiracy to commit wire fraud, on February 16, 2010.  The court does not include the counts against Anderson and Parker here but only lists the counts against the moving Defendants that were tried before the jury.

Farrington was charged with counts eighteen through twenty-seven, money laundering and aiding and abetting, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 2.  Counts twenty-eight through forty-two and forty-nine through fifty charge engaging in a monetary transaction with criminally derived property and aiding and abetting, in violation of 18 U.S.C. §§ 1957(a) and (d)(1) and 2. Farrington was charged with this offense in counts twenty-eight through thirty-two.  Shepherd was charged with this offense in counts thirty-three through thirty-seven.  Williams was charged with this offense in counts thirty-eight through forty-two.  Bell was charged with the offense in counts forty-nine and fifty.  Finally, Sanderson was charged with count forty-three, money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i).

After two and a half days of jury selection, the trial of this action began on February 18, 2010, and continued until March 31, 2010.  On March 23, 2010, after the government rested, Defendants Farrington, Shepherd, Williams, Sanderson, Jones, Bell, Andrews, and Mason (collectively, "Defendants") made oral motions pursuant to Rule 29 for judgment of acquittal on the counts against them.  The court took the motions under advisement.  On April 5, 2010, the jury returned with its verdict; Farrington, Williams, and Bell were found guilty on all counts brought against them, and the other Defendants were found guilty on some counts and not guilty on others.  Defendants thereafter filed additional motions for acquittal.

## II.      Legal Standard

Rule 29(a) of the Federal Rules of Criminal Procedure provides that after the government closes its evidence or after the close of all the evidence, on a defendant's motion, the court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  In determining whether there is sufficient evidence to support a conviction, the court

must determine "whether a rational juror could have found the elements of the offense proved beyond a reasonable doubt.  In so doing, we view the evidence in the light most favorable to the government, with all reasonable inferences and credibility choices made in support of the jury verdict."  *United States v. Valles*, 484 F.3d 745, 752 (5th Cir.), *cert. denied*, 551 U.S. 1155 (2007) (footnotes and citation omitted).

Rule 33(a) of the Federal Rules of Criminal Procedure allows the court, upon a defendant's motion, to "vacate any judgment and grant a new trial if the interest of justice so requires."  A motion for new trial should not be granted "unless there would be a miscarriage of justice or the weight of evidence preponderates against the verdict.  A new trial is granted only upon demonstration of adverse effects on substantial rights of a defendant."  *United States v. Wall*, 389 F.3d 457, 466 (5th Cir. 2004), *cert. denied*, 544 U.S. 978 (2005).

The court will set forth the essential elements of each of the counts of conviction.  It carefully considered existing Supreme Court and Fifth Circuit precedent, as well as the Fifth Circuit Pattern Jury Instructions, when preparing the jury charge in this case.  Accordingly, the court will set forth the elements of each crime as it did in its instructions to the jury.

To find Defendants guilty of count one, conspiracy in violation of 18 U.S.C. § 1349, the government had to prove each of the following beyond a reasonable doubt:

| | |
|---|---|
| *First:* | That each defendant and at least one other person made an agreement to commit the crime of wire fraud as charged in the Indictment; |
| *Second:* | That each defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose; and |
| *Third:* | That one of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the Indictment to accomplish some object or purpose of the conspiracy. |

**Memorandum Opinion and Order – Page 5**

Court's Instructions to the Jury (Mar. 30, 2010) 13-14.

To find Defendants Farrington, Williams, or Sanderson guilty of count two, bank fraud and aiding and abetting in violation of 18 U.S.C. §§ 1344 and 2, the government had to prove each of the following beyond a reasonable doubt:

*First:* That such defendant knowingly executed or attempted to execute a scheme or plan to obtain money or property from Compass Bank by means of false or fraudulent pretenses, representations, or promises;

*Second:* That such defendant acted with a specific intent to defraud Compass Bank;

*Third:* That the false pretenses, representations, or promises that each defendant made were material;

*Fourth:* That such defendant placed the financial institution at risk of civil liability or financial loss; and

*Fifth:* That Compass Bank was insured by the Federal Deposit Insurance Corporation.

*Id.* at 16.

To find Defendants guilty of counts three through seventeen, wire fraud and aiding and abetting in violation of 18 U.S.C. §§ 1343 and 2, the government had to prove each of the following beyond a reasonable doubt:

*First:* That the defendant knowingly created a scheme and artifice to defraud and to obtain money and property from bank and mortgage lenders by means of false and fraudulent pretenses, representations, and promises as described in the "Scheme and Artifice" section of the Indictment;

*Second:* That the defendant acted with a specific intent to defraud;

*Third:* That the defendant caused another to use interstate wire communications facilities for the purpose of carrying out the scheme; and

*Fourth:* That the scheme to defraud employed false material representations.

*Id.* at 18.

**Memorandum Opinion and Order – Page 6**

To find Defendant Farrington guilty of counts eighteen through twenty-seven, money laundering and aiding and abetting in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 2, the government had to prove each of the following beyond a reasonable doubt:

*First:*   That [he] knowingly conducted, or attempted to conduct, a financial transaction;

*Second:*   That the financial transaction, or attempted financial transaction, involved the proceeds of a specified unlawful activity, namely, wire fraud, in violation of 18 U.S.C. § 1343;

*Third:*   That [he] knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity; and

*Fourth:*   That [he] intended to promote the carrying on of the specified unlawful activity.

*Id*. at 21.

To find Defendants Farrington, Shepherd, Williams, or Bell guilty of counts twenty-eight through forty-two and forty-nine through fifty, engaging in a monetary transaction with criminally derived property and aiding and abetting in violation of 18 U.S.C. §§ 1957(a) and (d)(1) and 2, the government had to prove each of the following beyond a reasonable doubt:

*First:*   That the defendant knowingly engaged or attempted to engage in a monetary transaction;

*Second:*   That the defendant knew that the transaction involved criminally derived property;

*Third:*   That the property had a value greater than $10,000;

*Fourth:*   That the property was, in fact, derived from wire fraud, as alleged in the Indictment; and

*Fifth:*   That the transaction occurred in the United States.

*Id*. at 24.

**Memorandum Opinion and Order – Page 7**

To find Sanderson guilty of count forty-three, money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i), the government had to prove each of the following beyond a reasonable doubt:

*First:*     That [he] knowingly conducted, or attempted to conduct, a financial transaction;

*Second:*    That the financial transaction, or attempted financial transaction, involved the proceeds of a specified unlawful activity, namely, wire fraud, in violation of 18 U.S.C. § 1343;

*Third:*     That [he] knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity; and

*Fourth:*    That [he] intended to promote the carrying on of the specified unlawful activity.

*Id.* at 26.

Finally, to find any Defendant guilty of aiding or abetting in violation of 18 U.S.C. § 2 the government had to prove each of the following beyond a reasonable doubt:

*First*:     That, with respect to Count Two, the offense of bank fraud was committed by some person; with respect to Counts Three through Seventeen, the offense of wire fraud was committed by some person; with respect to Counts Eighteen through Twenty-Seven, the offense of money laundering was committed by some person; with respect to Counts Twenty-Eight through Forty-Two and Forty-Nine through Fifty, the offense of engaging in a monetary transaction with criminally derived property was committed by some person; and with respect to Count Forty-Three, the offense of money laundering was committed by some person;

*Second*:    That the defendant associated himself or herself with the criminal venture;

*Third*:     That the defendant purposefully participated in the criminal venture; and

*Fourth*:    That the defendant sought by action to make that venture successful.

*Id.* at 31.

## III.     Analysis

Each Defendant moved for acquittal pursuant to Rule 29 of the Federal Rules of Civil Procedure after the government rested.  Several Defendants also moved for acquittal after the jury's verdict.  The government opposes all of Defendants' motions for acquittal.

### A.     Evidence

Before reaching the merits of Defendants' motions, the court sets forth the scheme, considering the evidence presented at trial in the light most favorable to the government.[2]  The government presented evidence of a criminal conspiracy to obtain mortgage loans using a variety of false information, including inflated appraisals, false reports of income, and bogus leases and false affidavits regarding residency.  The charged conspiracy related to eleven residential properties.

#### 1.     Defendants

Farrington was at the center of the criminal conspiracy.  He was president of Eric Farrington Seminars, Inc. and Prestige Capital Corporation, which also did business as Farrington Mortgage Group.  He managed EFC Investments, LLC, which did business as EFC Management Company. Farrington recruited investors to purchase real estate through an investment program he promoted, and he paid them and promised he would find tenants, collect rents, pay the mortgage, and make necessary repairs.

---

[2]The court has extensively reviewed the trial evidence in considering these motions.  The allegations set forth in the Indictment and presentation of evidence by the government did not always run parallel.  For example, while certain counts were clearly related to specific properties, the majority of counts in the Indictment was categorized by Defendant, rather than property, and the court, in reviewing the jury's verdict in conjunction with the evidence, spent considerable time determining which counts related to which property.  Although the manner in which the evidence was presented did not initially make it readily apparent that the evidence was sufficient to sustain the counts of conviction, the court is convinced that a review of all the evidence, and the reasonable inferences that could be drawn from the evidence, establishes that a reasonable juror could have found that the government proved each of the elements of the counts of conviction beyond a reasonable doubt.

Shepherd was a mortgage broker who did business as EFC Capital Mortgage Company.  She processed eight of the mortgage loans at issue.  She received a broker's fee for each loan originated by EFC Capital Mortgage, and she received higher commissions based upon the inflated appraisals performed by Bell, Williams, and Andrews.  When Shepherd received commission checks, she deposited them into EFC Capital Mortgage's bank account and immediately wrote checks back to Farrington.

Williams was a certified real estate appraisal who did business as Executive Certified Appraisal.  He introduced Anderson to Farrington and taught him "bird-dogging," which is finding suitable properties for investors.  Williams, Anderson, and Farrington preferred properties that were for sale by owner, rather than properties marketed by a real estate agent.  Williams and Anderson would identify properties for Farrington, and Williams would determine an inflated sales price based upon the sales of superior homes in the same area.  He gave the sales contracts to Farrington.  Williams, Farrington, Anderson, and Bell were paid at closing with loan proceeds, using a Transaction Letter of Disbursement Agreement ("TLDA") signed by the seller.  Farrington would receive seventy percent, and Williams and Anderson would share the remaining thirty percent.

Sanderson was vice-president of Farco Construction, Inc., which also did business as Farrington Mortgage Group.  He also was a licensed loan officer for Shepherd at EFC Capital Mortgage.  He located properties for Farrington, managed properties, found tenants, and performed other services for him.  Sanderson and Parker had been friends since serving together in the Air Force.  Parker saw Farrington's infomercial on television, and he and Sanderson met Farrington at Slider & Blues in February 2002.  Mason also attended this meeting.

Bell was in the real estate management business and was president of Togetherness, Inc. Bell also did business as The Togetherness Group and TTG, Inc. He sold three properties owned by Sabrina Washington, and he used a forged power of attorney with respect to these sales and also signed two false marital affidavits.

Andrews was chief executive officer of Second Chance Mortgage, Inc. He recruited individuals to invest in properties. He brokered loans for two of the properties.

Jones was a real estate agent. He received proceeds from seven of the eleven transactions and was the buyer of one of the properties. Jones bought properties through Farrington and Shepherd as an investor and was paid more than $135,000. He also recruited at least one buyer as a investor.

Mason was an employee of Prestige Capital Corporation. He was employed by Farrington and also invested in several properties through Farrington and Shepherd. He was present at the February 2002 Slider & Blues meeting with Parker, Sanderson, and Farrington.

All of these Defendants, except Andrews and Mason, were convicted of conspiracy to commit wire fraud relating to the sale of the eleven residential properties. The rest of the counts relate to one of the eleven properties. The court will next set forth the evidence with respect to each of the eleven properties.

### 2.     Properties

#### a.     Travis

The first property is located at 1420 Travis Circle South ("Travis"), Irving, Texas, and relates to count one, conspiracy to commit wire fraud, and count two, bank fraud and aiding and abetting, for which Farrington, Williams, and Sanderson were convicted. The sale of this property closed on April 12, 2002. Farrington located the property and decided Sanderson should be the buyer.

The seller of this property was a relocation company that had marketed the home for more than a year.  Its original asking price was $379,900, and the price had been lowered several times.  Williams prepared an inflated appraisal, stating that the home's value was $540,000, when the asking price was $349,900.  A note on an MLS listing in Williams's workfile stated:  "Eric:  Lookup wide range will do 575k - 600k."  The government's witness Jim Pearson ("Pearson") testified that the comparable properties used in the appraisal were picked to arrive at a predetermined result.  He testified further that Williams's appraisal overvalued the property by $218,000.  This appraisal was sent to NTFN, Inc. ("NTFN") and Compass Bank, and both lent money for the Travis purchase.

Farrington submitted an invoice for $190,100 in upgrades and repairs.  David Franks ("Franks") lived in the house with his wife, and he testified that no repairs were made to the home.  Franks also testified that he mailed his lease payment to Farrington's post office box.  The seller's agent, Patsy Wilson, testified that the only repair that was made to the house was a roof that cost less than $15,000.  Farrington collected $5,000 from Sanderson and Parker for the roof repair.

Parker added Sanderson to his bank account so that the lender would see "seasoned" money in his account.  NTFN received a verification of this bank account; it loaned Sanderson $400,000.  Sanderson falsely stated that he intended to occupy the home, and he submitted a false lease for his home in Rockwall.  Parker testified that he saw Sanderson daily, or almost daily, and that he never moved into the Travis home.

Sanderson also obtained a loan from Compass Bank for $108,000.  On the loan application, he stated that he earned more than $400,000 per year.  At the time he made this statement, he was employed by Applied Materials.  He earned $26,922.91 in 2000, $84,518.64 in 2001, and $37,984 in 2002.  Republic Mortgage Insurance Company sent a verification request to Applied Materials

regarding Sanderson's income; Parker signed a verification of employment form that did not address his income.

Two loans were used to buy the property: $400,000 from NTFN, and $108,000 from Compass Bank.  Sanderson made a down payment of approximately $35,000, from the joint account now belonging to him and Parker.  At closing, $190,100 was paid to Eric Farrington Seminars.  Parker testified that Farrington reimbursed him for the down payment and also paid him an additional $35,000.

### b.    Azalea

Nearly two years passed before the close of the next property, 6231 Azalea Lane ("Azalea"), Dallas, Texas, on January 9, 2004.  This property is included in the following counts that were tried: count one, conspiracy to commit wire fraud; counts three and four, wire fraud and aiding and abetting, for which Farrington, Shepherd, Williams, and Sanderson were convicted; counts twenty-eight, twenty-nine, and thirty-eight, engaging in a monetary transaction with criminally derived property and aiding and abetting, for which Farrington and Williams were convicted; and count forty-three, money laundering, for which Sanderson was convicted.

The buyer of this property was John Harris, and it was sold by Mark Fackler ("Fackler"). Gandhi Ben Morka ("Morka") prepared an appraisal for the property for EFC Capital Mortgage, assessing its value at $630,000, and the appraisal included photographs of the interior of the home. Fackler testified that Williams took measurements and photographs inside the house.  Another appraisal by Steve Warren ("Warren") valued the home at $650,000.  Pearson testified that Morka's appraisal overvalued the home by $230,000 and relied on comparable properties that were superior

to Azalea.  He also testified that Warren's appraisal also used invalid comparables and that Warren counted the guest quarters square footage twice.

Harris made a down payment of $9,153.10, which was given to him by Sanderson.  Sanderson was also the loan officer; he completed the loan application after receiving Harris's bank statements and W-2s.  Harris disclaimed knowledge of falsity on the application when the investigation began. The loan application falsely stated that Harris earned $14,000 per month; he actually earned between $90,000 and $105,000 annually.  It also falsely stated that Harris intended to use Azalea as his primary residence and that he had leased his residence at 3817 Lost Creek.  The application also included a false occupancy affidavit.  Harris's signature on the loan application was forged. Sanderson also faxed a letter to the lender regarding the sales contract and a request for title commitment to Reunion Title.

The sale of Azalea was funded by two loans.  The title company disbursed loan proceeds of $5,760 to EFC Capital Management, $26,964 to Williams, $26,964 to Anderson, and $95,151 to Prestige Capital.  Prestige Capital thereafter made the following payments:  $5,000 to EFC Capital Mortgage, $37,949 to EFC Investments, and $5,000 each to Parker and Sanderson.  After closing, Sanderson handed Harris a check for $20,000 from the loan proceeds.

### c.    Cliffbrook

The next property was located at 7730 Cliffbrook Drive ("Cliffbrook"), Dallas, Texas, and the sale of this property closed on April 28, 2004.  This property is included in the following counts that were tried:  count one, conspiracy to commit wire fraud; counts five and six, wire fraud and aiding and abetting, for which Farrington, Shepherd, Williams, and Bell were convicted; count nineteen, money laundering and aiding and abetting, for which Farrington was convicted; and counts

thirty-nine and forty-nine, engaging in a monetary transaction with criminally derived property and aiding and abetting, for which Williams and Bell were convicted.[3]

This property was sold by Sabrina Washington and bought by Reginald Bibb ("Bibb"). Shepherd brokered the loan application. Bibb met with her at her home. He testified that Farrington asked him to sign a bogus loan for his home to Al Fleming, who is Bibb's friend and Shepherd's ex-boyfriend.[4] The loan application contained false information.

Bell was involved in the sale of Cliffbrook, as well as two other properties owned by Sabrina Washington. In selling these homes, he used a forged power of attorney received from Lynarval Washington to conceal the true sales price of the home. Bell also signed a false marital affidavit under oath, stating that Sabrina Washington was a single woman. Bell signed the affidavit when he had been dealing with her husband, Jonathan Washington. The Washingtons were unaware of his dealings with Farrington. Bell also told the special agent that the seller had told him to get the power of attorney to Lynarval Washington to get it signed.

The power of attorney shows that it was notarized in Tarrant County. Julie Ballard, who worked for Fidelity National Title, usually called sellers who signed powers of attorney to verify them. Bell gave the title company Sabrina Washington's street address and his telephone numbers. Sabrina Washington testified that she never heard from the title company.

---

[3]Jones was indicted on counts five and six, wire fraud and aiding and abetting, but the jury found him not guilty on these counts.

[4]The government argued that Bibb first told agents that it was Shepherd who asked him to sign the bogus lease. There was no evidence admitted at trial to support this contention. Bibb was questioned by the government about this matter during the trial, but he did not remember telling the agent that it was Shepherd. During trial, the government did not ask the agent about this conversation. Accordingly, there was no evidence before the court and jury about what Bibb told agents when he was first questioned about the lease.

The sale of Cliffbrook was funded by two loans.  The title company disbursed loan proceeds of $7,190 to EFC Capital Management, $14,997 to Williams, $14,997 to Anderson, $14,000 to Bell, and $73,322 to Prestige Capital.  Prestige Capital thereafter made payments to Bibb, Jones, and Farrington.  EFC Capital Mortgage also made a payment to Farrington.

### d.      Cinderella

Just over a month later, the next property, 10907 Cinderella Lane ("Cinderella"), Dallas, Texas, closed on June 4, 2004.  This property is included in the following counts that were tried: count one, conspiracy to commit wire fraud; count seven, wire fraud and aiding and abetting, for which Farrington, Shepherd, Williams, and Bell were convicted; count twenty, money laundering and aiding and abetting, for which Farrington was convicted; and counts thirty-three, thirty-four, forty, and fifty, engaging in a monetary transaction with criminally derived property and aiding and abetting, for which Shepherd, Williams, and Bell were convicted.[5]

This property was sold by Sabrina Washington and bought by Patsi Patterson ("Patterson").[6] Bell used the forged power of attorney with respect to the sale of this property and a false marital affidavit.

The home was appraised by Liz Altizer ("Altizer") for $431,300.  There is a fax transmission from Williams's telephone number with a handwritten note that states:  "we need repair costs of 85k to 100k to be consistent with repair/upgrade/update."  The handwriting is similar to the handwritten note relating to Travis.  A note on this document by Altizer states that a contractor estimated repairs

---

[5]Jones was indicted on count seven, wire fraud and aiding and abetting, but the jury found him not guilty on this count.

[6]Patterson was not indicted on any counts.  She, however, also received a payment from Prestige Capital after the close of Azalea and 6915 Winterwood.

**Memorandum Opinion and Order – Page 16**

at $10,615.  Pearson testified that Altizer overvalued the property by $96,300 and that she used cherry-picked comparables.

The sale of Cinderella was funded by a single loan.  The title company disbursed loan proceeds of  $14,050 to EFC Capital Management, $14,247 to Williams, $14,247 to Anderson, $20,200 to Bell, and $43,595 to Prestige Capital.  Prestige Capital thereafter made payments to Patterson, Jones, and Farrington.  EFC Capital Mortgage also made a payment to Farrington.

### e.  Arborgate

The next property, 7617 Arborgate ("Arborgate"), Dallas, Texas, closed on October 28, 2004. This property is included in the following counts that were tried:  count one, conspiracy to commit wire fraud; counts eight and nine, wire fraud and aiding and abetting, for which Farrington, Shepherd, and Williams were convicted; count twenty-one, money laundering and aiding and abetting, for which Farrington was convicted; and counts thirty-five, thirty-six, and forty-one, engaging in a monetary transaction with criminally derived property and aiding and abetting, for which Shepherd and Williams were convicted.[7]

 The buyer of Arborgate was Karen Mack ("Mack"), and the property was sold by Steve Ringer.  Mack was recruited by Jones; he told her that he was a real estate agent who helped find tenants for investment properties.

Mack faxed Jones financial data, including pay stubs, W-2s, tax returns, bank statements, and 401k statements.  She later met with Jones and Farrington; Farrington told her that she would buy the property below market value and they would split the proceeds two years later.  The loan application

_____

[7]Jones was indicted on counts eight and nine, wire fraud and aiding and abetting, but the jury found him not guilty on these counts.

was signed by Shepherd and included false information, including statements about Mack's income, her intention to use the home as her primary residence, the value of her personal property, and the lease of her home.

Jerry Evans ("Evans"), who is now deceased, appraised Arborgate.  He appraised the property for $398,000.  Evans's workfile includes a grid listing three superior comparable properties and a request for an appraised value of $399,000.  Pearson testified that the appraisal was not independent and that it overvalued the property by $73,000.

Jones brought the sales contract and joint venture agreement to Mack to sign.  He gave her cash to buy a cashier's check for $1,208.71 to cover closing costs.  Farrington paid Mack $15,000 for buying the property, which was delivered by Jones.

The sale of Arborgate was funded with two loans.  The title company disbursed loan proceeds of  $8,019 and $6,368 to EFC Capital Management, $14,374 to Williams, $14,374 to Anderson, $20,200 to Bell, and $67,078 to Prestige Capital.  Prestige Capital thereafter made payments to Mack, Jones, and Farrington.  EFC Capital Mortgage also made a payment to Farrington after the loan closed.

Mack filed a complaint against Shepherd with the Texas Department of Savings and Mortgage Lending ("TDSML").  Shepherd responded and said that Farrington was her loan processor and documents were under her direct supervision.  She directed TDSML to Pete Thompson, an attorney who also worked for Farrington.  Mack replied and stated that she had never met Shepherd or discussed the loan application with Farrington.

f.      Ashridge

The property located at 13735 Ashridge Drive ("Ashridge"), Dallas, Texas, closed on December 8, 2004.  This property is included in the following counts that were tried:  count one, conspiracy to commit wire fraud; counts ten and eleven, wire fraud and aiding and abetting, for which Farrington, Shepherd, Williams, Jones, and Bell were convicted; count twenty-two, money laundering and aiding and abetting, for which Farrington was convicted; and count forty-two, engaging in a monetary transaction with criminally derived property and aiding and abetting, for which Williams was convicted.[8]

Chris Thomas sold the property; Jones was the buyer.  The loan application was signed by Shepherd and included false information.  The false statements included that Jones's income was $13,825 per month rather than $80,000 per year, that he had purchased other properties from Farrington and sold two, and that the property would be his primary residence.  There was a false lease on Jones's primary residence.  He told the agent that he resided at 5425 Caladium Drive since 2004, that he did not earn $13,825 per month, that he signed the loan application, and that he signed the occupancy affidavit but did not intend to occupy the Ashridge home.  Jones's tax returns show that he did not earn $13,825 per month.

The sale of Ashridge was funded with two loans.  The title company disbursed loan proceeds of $3,997 and $550 to EFC Capital Management, $12,426 to Williams, $12,426 to Anderson, $2,004 and $2,004 to TTG, Inc., and $68,507 to Prestige Capital.  Prestige Capital thereafter made payments

---

[8]Sanderson was indicted on counts ten and eleven, wire fraud and aiding and abetting, but the jury found him not guilty on these counts.

to Jones, EFC Management Co., and Farrington.  EFC Capital Mortgage also made a payment to Farrington.

### g.     6824 Winterwood

The sale of the property located at 6824 Winterwood Lane ("6824 Winterwood"), Dallas, Texas, closed on March 11, 2005.  This property is included in the following counts that were tried: count one, conspiracy to commit wire fraud; counts twelve and thirteen, wire fraud and aiding and abetting, for which Farrington and Shepherd were convicted; count twenty-three, money laundering and aiding and abetting, for which Farrington was convicted; and count thirty, engaging in a monetary transaction with criminally derived property and aiding and abetting, for which Farrington was convicted.

The property was sold by Marie Kazura ("Kazura") and bought by Lauritz E. Gibbs ("Gibbs"). Shepherd signed the loan application, which included false information.  The property was listed for sale for $319,000; Farrington asked Kazura if she would agree to raise the sales price and return the difference to him for repairs and upgrades if he got an appraisal showing a higher value.  They agreed that she would receive $309,000, but the sales price would be $390,000, with the difference going to Farrington for repairs and upgrades.

The sale of 6824 Winterwood was funded with two loans.  The title company disbursed loan proceeds of $3,920 to EFC Capital Management and $81,746 and $500 to Prestige Capital.  Prestige Capital thereafter made payments to Gibbs and Farrington.  EFC Capital Mortgage also made a payment to Farrington.

### h.    6915 Winterwood

The sale of 6915 Winterwood Lane ("6915 Winterwood"), Dallas, Texas, closed on May 31, 2005. This property is included in the following counts that were tried: count one, conspiracy to commit wire fraud; count fourteen, wire fraud and aiding and abetting, for which Farrington and Mason were convicted; count twenty-four, money laundering and aiding and abetting, for which Farrington was convicted; and count thirty-one, engaging in a monetary transaction with criminally derived property and aiding and abetting, for which Farrington was convicted.[9]

The property was sold by Paul Beyer ("Beyer") and bought by Anna Powell ("Powell"). Beyer owned the home free and clear, and he was referred to Farrington by Ken Frazier ("Frazier"), the seller of 6840 Winterwood. Frazier was paid $2,500 by Farrington. Shepherd signed the loan application, which included false information.

This transaction included a bogus deed of trust. The deed of trust was dated May 6, 2005, and was between Prestige Capital and Beyer in the amount of $95,000. On the deed of trust is a handwritten note with instructions to refile the deed after correcting the trustee. The deed of trust was filed on May 12, 2005, after the sales contract was signed, then refiled and recorded on May 19, 2005. Mason signed a letter on Prestige Capital letterhead, stating that the payoff amount of $113,503.36 was owed to it. He signed another letter as trustee transferring the deed of trust from Farrington to him. The agent testified that Mason could not explain why he wrote the letter or transferred the deed from Farrington's name to his.

---

[9]Shepherd and Jones were also indicted on count fourteen, wire fraud and aiding and abetting, and Shepherd was indicted on count thirty-seven, engaging in a monetary transaction with criminally derived property and aiding and abetting. The jury found Shepherd and Jones not guilty on these counts.

The sale of 6915 Winterwood was funded by a single loan.  The title company disbursed loan proceeds of $7,570 to EFC Capital Management and $113,503 to Prestige Capital.  Prestige Capital thereafter made payments to Powell, Farrington, Patterson, and Jones.

### i.      6840 Winterwood

The sale of 6840 Winterwood Lane ("6840 Winterwood"), Dallas, Texas, also closed on May 31, 2005.  This property is included in the following counts that were tried:  count one, conspiracy to commit wire fraud; count fifteen, wire fraud and aiding and abetting, for which Farrington and Mason were convicted; count twenty-five, money laundering and aiding and abetting, for which Farrington was convicted; and count thirty-two, engaging in a monetary transaction with criminally derived property and aiding and abetting, for which Farrington was convicted.[10]

This property was sold by Frazier and bought by Christopher Williams.  This transaction also included a bogus deed of trust.  The deed of trust was between Prestige Capital and Frazier in the amount of $85,000; Frazier did not have a loan with or owe Prestige Capital any money.  Mason signed a letter, dated May 23, 2005, changing the trustee from Farrington to Mason.  There is also an exhibit showing a handwritten note on the deed of trust to have it refiled to correct the trustee name; this document was notarized by a title company employee.  The agent testified that Mason could not explain why he wrote the letter or transferred the deed from Farrington's name to his.  The deed of trust shows a second lien in favor of Prestige for $93,982.92.  The lien appears on the HUD-1, and the funds were distributed to Farrington.  Parker testified that he was paid $5,000 to sign a bogus lease.

---

[10] Shepherd and Sanderson were also indicted on count fifteen, wire fraud and aiding and abetting, and Shepherd was indicted on count thirty-seven, engaging in a monetary transaction with criminally derived property and aiding and abetting.  The jury found Shepherd and Sanderson not guilty on these counts.

The sale of 6840 Winterwood was funded by a single loan. The title company disbursed loan proceeds of $7,960 to EFC Capital Management and $93,093 to Prestige Capital. Prestige Capital thereafter made payments to Frazier, Christopher Williams, EFC Management Co., Sanderson, Mason, and Farrington. EFC Capital Mortgage made a payment to Farrington.

### j.   Creek Bend

The sale of the property located at 7012 Creek Bend Road ("Creek Bend"), Dallas, Texas, closed on December 19, 2005. This property is included in the following counts that were tried: count one, conspiracy to commit wire fraud; count sixteen and seventeen, wire fraud and aiding and abetting, for which Farrington, Sanderson, and Andrews were convicted; and count twenty-six, money laundering and aiding and abetting, for which Farrington was convicted.[11]

In this case, Uril Greene ("Greene") was the seller, and Earl Young ("Young") was the buyer. Andrews recruited Young, his pastor, to buy the property. Young met with Farrington, who told him that Farrington would make him rich by using his name and credit score to obtain properties. Farrington said that he would set aside money to pay the mortgage, taxes, and insurance, that he would manage the properties and find tenants, and that Young would have no out-of-pocket expenses.

The property was listed for $260,000, which was reduced to $240,000. Farrington told Greene that he wanted to renovate the sunroom and asked him to raise the sales price to cover the renovation. No renovations were done. Gary Straach ("Straach") performed an appraisal, stating that the value was $284,000. The workfile contains an appraisal request from Andrews, using the EFC Capital

---

[11] Jones was also indicted on counts sixteen and seventeen, wire fraud and aiding and abetting, but the jury found him not guilty on these counts.

Mortgage fax, to Clifford Dodson, stating:  "value needed $325,000."  Pearson testified that the appraisal overvalued the property by $29,000, and that the comparables that were used were superior to the Creek Bend property.

The loan application was prepared by Farrington or Andrews and was submitted to lenders by Andrews.  Andrews was also the broker.  Young gave Andrews bank statements.  The loan applications included false statements, including that Young had a higher income than he actually did, that Young intended to occupy the property, and that he was renting out his primary residence. Andrews wrote a letter to the lender to bolster the false income on the loan application.

The sale of Creek Bend was funded by two loans.  The title company disbursed loan proceeds of $11,710 to Second Chance Mortgage, and $59,000 to Farco Construction Co.  Farco thereafter made payments to Young, Sanderson, Jones, Powell, and Farrington.

Young never saw the property and did not pay any closing costs.  Farrington paid him $15,000 for buying the property.  Farrington paid the mortgages for the first few months, but later the property was foreclosed.

### k.   Appalachian

Finally, the last transaction involved the property at 1509 Appalachian Drive ("Appalachian"), Allen, Texas, which closed on January 17, 2006.  This property is included in the following counts that were tried:  count one, conspiracy to commit wire fraud; and count twenty-seven, money laundering and aiding and abetting, for which Farrington was convicted.

Young also bought this property; the seller was Cora Manuel ("Manuel").  Andrews recruited Young to buy this property, and he also brokered the loan.

Manuel was facing foreclosure.  Farrington called her and told her that he could save the house and that she could still live there.  He told her he would find an investor to buy the house, lease it back to her for two years, and sell it to her after two years.  Farrington also told her that she would get $25,000 to $30,000 from the proceeds of the sale from the investor.

The loan application included several false statements:  that Appalachian would be Young's primary residence, that he earned $9,000 per month, and that he had leased or sold his primary residence.  The appraisal was purported to be done by Straach.  Pearson testified that the appraisal correctly reflected the market value of the property, but that surplus funds were created by shorting the seller's proceeds.

Manuel drove Farrington and Andrews to the closing.  Andrews joined her for the closing.  She saw the disbursement agreement, signed it, and then confronted Farrington.  She received less than $6,000 from the sale; Farrington told her that he had incurred a lot of expenses.

The sale of Appalachian was funded by two loans.  The title company disbursed loan proceeds of $6,535 to Second Chance Mortgage, and $43,190 to Farco Construction Co.  Farco thereafter made payments to Sanderson, EFC Investments, and Young.   EFC Investments made payments to Sanderson and Jones.

After closing, Manuel continued to live in the home.  She paid rent to Farrington.  He told Young that Manuel was not paying rent.  Farrington did not use Manuel's rent payments to pay the mortgage, and Appalachian was foreclosed by the lenders.

### B.      Defendants' Motions for Acquittal

### 1.      Farrington

Farrington made an oral motion for acquittal after the government rested.  He was later granted leave to file a written memorandum in support of his oral motion.  The government filed a written response.

Before reaching Farrington's arguments, the court notes that his only pending motion is the motion he made after the government rested.  As the court noted in granting his motion for leave to file a supplemental memorandum, Farrington's deadline to file a motion for acquittal after the jury's verdict was April 19, 2010, and he did not file such a motion.  Order (May 7, 2010) 1.  The court specifically noted that it was granting leave for Farrington to file a memorandum in support of his oral motion.  *Id*.  Pursuant to Rule 29(b), the court "must decide the motion on the basis of the evidence at the time the ruling was reserved."  In this case, ruling was reserved when the government rested, and the court only considers the evidence and testimony in the record at that time.

In his motion for leave, Farrington raises several arguments relating to the evidence at the time that the government rested.  He contends that there was no evidence that Defendant intended to deceive any lender using fraudulent appraisals or that he caused any borrower to overstate his or her income.  He contends that the government calls the borrowers "innocent," yet alleges that they falsely claimed their residences had been leased or signed false occupancy affidavits.  He contends that he cannot be convicted in a case with innocent borrowers and appraisals that were not fraudulent.  Farrington also contends that Pearson, the government's witness, testified that the appraisals overstated the fair market value of certain properties but that there was no evidence that they were

fraudulent or intended to deceive any lenders.  Farrington also notes that in every case there was a review appraisal and therefore there could have been no intent to deceive any lender.

After the court granted Farrington's request to file a memorandum in support of his oral motion, he filed a brief on May 12, 2010.  In this brief, Farrington argues that the jury instructions were flawed because they lacked a unanimity instruction.  He contends that the government charged six overt acts and seven false and fraudulent misrepresentations and that there is no way to know if the jurors agreed.  He also argues that there is no evidence of fraudulent appraisals or bogus liens. He contends that there was no evidence that he instructed any borrower to lie about his or her intent to reside in a property or about his or her income.

With respect to Farrington's argument about a unanimity instruction, the government contends that this issue is not properly before the court because his only pending motion is the motion he made before the jury was charged.  It argues that this issue may only be raised by Farrington on appeal.

The court agrees with the government.  This issue was not a part of Farrington's Rule 29(a) motion, which was made before the jury was instructed.  Moreover, Farrington specifically raised this objection during the court's conference regarding the jury charge, and the court overruled his objection at that time.  To the extent Farrington wishes to make this argument, the proper avenue is an appeal, not a Rule 29(a) motion.

With respect to Farrington's arguments about the sufficiency of the evidence, the government argues that the evidence against him was overwhelming, especially in the light most favorable to the government.  It contends therefore that his motion should be denied.

Farrington overemphasizes the importance of the "review" appraisals conducted by the lenders.  The court finds, however, that these reviews were "desk reviews."  The evidence at trial

established that there are differences between desk reviews and field appraisals. The record reflects the methodology that was used in a field appraisal. A desk review is not a full, independent appraisal, and the evidence made it unequivocally clear that it is not a comprehensive appraisal like those conducted in the field. A desk review is simply a review on paper. Accordingly, the court finds that while lenders did desk reviews this does not establish that the appraisals were legitimate or that they were supportable.

The court has carefully reviewed Farrington's arguments, the government's response, the record, and the applicable law. It concludes that there was sufficient evidence to support the jury's conviction of Farrington on all counts. Despite the semantic argument he has made throughout this case, whether the borrowers were described as "straw borrowers" or "innocent borrowers," there is evidence that Farrington and his coconspirators sought or created inflated or fraudulent appraisals for various properties, that there were false statements made on loan applications, that he and others created false invoices for services, that he and others created false deeds of trust, and that he and the other Defendants received loan proceeds from each of the properties in the Indictment. Accordingly, the court **denies** Farrington's oral Rule 29(a) motion for acquittal.

### 2.    Shepherd

Shepherd moves for acquittal on counts one, three through thirteen, and thirty-three through thirty-six pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure. She also made an oral motion for acquittal after the government rested. In the alternative, Shepherd moves for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.

Shepherd argues generally that even considering the evidence in the light most favorable to the government, no reasonable juror could conclude that the government proved all the elements of

the various counts against her beyond a reasonable doubt.  She contends that there was insufficient evidence, before or after the government rested, to establish that she intended to violate the law or defraud anyone or that she acted with intent to promote a fraudulent or illegal scheme.  With respect to her request for a new trial, Shepherd contends that the court may presume that evidence regarding other Defendants was held against her in violation of the court's instructions.  She also states that there may have been inappropriate influence on the jury by an outside agency and that this matter may be raised by additional motions.

The government opposes Shepherd's motion and contends that the evidence supports the jury's verdict of guilty against her.  It sets forth the evidence introduced at trial against her.  Shepherd was a licensed mortgage broker who processed all but three of the  mortgage loans in the Indictment, and she signed and approved most of the loan applications.  The loan applications of Bibb, Jones, Mack, Gibbs, Christopher Williams, and Powell all contained false information, and these applications, except for Bibb and Christopher Williams, were signed by Shepherd.

The court has carefully reviewed Shepherd's motion, the government's response, the record, and the applicable law.  It determines that she is not entitled to acquittal on the counts of conviction or a new trial.  The evidence presented to the jury was sufficient to sustain the counts of conviction. Shepherd has failed to show that the interests of justice require a new trial.  Although she raises the

issue of jury interference, she provides no specifics or evidence in support of this contention.[12] Accordingly, the court **denies** Shepherd's motions for acquittal and for a new trial.

### 3. Williams

Williams was convicted on all counts for which he was indicted; he moves pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure for acquittal on all counts.[13]  He also made an oral motion for acquittal after the government rested.  Williams argues generally that the jury's verdict is manifestly against the evidence presented at trial and that the government failed to prove the essential elements of the counts against him.

The government opposes Williams's motion and contends that the evidence supports the jury's verdict of guilty against him.  It sets forth the evidence introduced at trial against him.  Of the eleven property transactions in the Indictment, Williams received money from six.  In five of those transactions, he received loan proceeds distributed by a title company.  Although there is not specific evidence with respect to Williams's actions with each property, the government argues that the jury was instructed as to liability pursuant to *Pinkerton v. United States*, 328 U.S. 640 (1946),[14] and that

---

[12]Shepherd and Sanderson both make reference to potential jury interference.  The court is not certain to what they refer, and no additional motions have been filed.  To the extent that Defendants refer to a comment that a juror allegedly made during the trial about "hanging" one of the Defendants, the court thoroughly investigated this allegation during the trial and determined that the jury was not tampered with or inappropriately influenced, or that any juror was predisposed to finding any Defendant guilty because of the alleged statement.  The court's inquiry did not establish whether the comment was made.  As reflected in the record, the court made extensive inquiries in court and *in camera* to ensure that the jury could render a fair verdict.  Further, the court repeatedly admonished the jury of its duty not to discuss the case with anyone, including  fellow jurors, until it was time for jury deliberations.  Even though existing precedent did not require it to remove any jurors, the court, at the conclusion of trial and out of an abundance of caution, removed the two jurors who allegedly participated in the inappropriate conversation.

[13]Defendant Williams filed two motions that are substantively identical on April 14, 2010, and April 15, 2010.  The court will deny the second motion as moot.

[14]The court included a *Pinkerton* instruction in its charge to the jury regarding jointly undertaken criminal activity and foreseeable conduct in furtherance of such activity.  The Fifth Circuit affirmed a district court that used such an instruction and "properly instructed the jury that someone who jointly undertakes a criminal activity with others is accountable for their reasonably foreseeable conduct in furtherance of the joint undertaking."  *United States v. Morrow*,

the other evidence supports Williams's convictions.  The court agrees.  The law does not require that there be specific evidence with respect to each piece of property when there is jointly undertaken criminal activity.

The court has reviewed the parties' arguments, the evidence and record, and the applicable law.  It determines that Williams is not entitled to acquittal on the counts of conviction.  The evidence presented to the jury was sufficient to sustain the counts of conviction.  Accordingly, the court **denies** Williams's motions for acquittal.

### 4.      Sanderson

Sanderson moves for acquittal on counts one through four, sixteen through seventeen, and forty-three pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure.  He also made an oral motion for acquittal after the government rested.  In the alternative, Sanderson moves for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.

Sanderson argues generally that even considering the evidence in the light most favorable to the government, no reasonable juror could conclude that the government proved all the elements of the various counts against him beyond a reasonable doubt.  He contends that there was insufficient evidence, before or after the government rested, to establish that he intended to violate the law or defraud anyone or that he acted with intent to promote a fraudulent or illegal scheme.  With respect to his request for a new trial, Sanderson contends that the court may presume that evidence regarding other Defendants was held against him in violation of the court's instructions.  He also states that there may have been inappropriate influence on the jury by an outside agency and that this matter may be raised by additional motions.

---

177 F.3d 272, 293 (5th Cir.), *cert. denied*, 528 U.S. 932 (1999).

The government opposes Sanderson's motion and contends that the evidence supports the jury's verdict of guilty against him.  It sets forth the evidence introduced at trial against him. Sanderson worked for Farrington and was vice-president of Farco Construction, Inc.  He was a licensed loan officer for Shepherd at EFC Capital Mortgage.  He located properties for Farrington, managed properties, found tenants, and performed other services for him.  Although there is not specific evidence with respect to Sanderson's actions with each property, the government argues that the jury was instructed as to liability pursuant to *Pinkerton* and that the other evidence supports Sanderson's convictions.

The court has carefully reviewed Sanderson's motion, the government's response, the record, and the applicable law.  It determines that he is not entitled to acquittal on the counts of conviction or a new trial.  The evidence presented to the jury was sufficient to sustain the counts of conviction. Sanderson has failed to show that the interests of justice require a new trial.  Although he raises the issue of jury interference, he provides no specifics or evidence in support of this contention. Accordingly, the court **denies** Sanderson's motions for acquittal and for a new trial.

### 5.    Jones

Jones was convicted on three counts; he moves pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure for acquittal on counts one, ten, and eleven.  He also made an oral motion for acquittal after the government rested.  Jones argues generally that the jury's verdict is manifestly against the evidence presented at trial and that the government failed to prove the essential elements of the counts against him.

The government opposes Jones's motion and contends that the evidence supports the jury's verdict of guilty against him.  It sets forth the evidence introduced at trial against him.  Jones received

proceeds from seven of the eleven properties in the Indictment.   Although there is not specific evidence with respect to Jones's actions with each property, the government argues that the jury was instructed as to liability pursuant to *Pinkerton* and that the other evidence supports Jones's convictions.

The court has reviewed the parties' arguments, the evidence and record, and the applicable law.  It determines that Jones is not entitled to acquittal on the counts of conviction.  The evidence presented to the jury was sufficient to sustain the counts of conviction.  Accordingly, the court **denies** Jones's motions for acquittal.

### 6.    Bell

Bell was convicted on all counts for which he was indicted; he moves pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure for acquittal on all counts of conviction.   He also made an oral motion for acquittal after the government rested.  Bell argues generally that the jury's verdict is manifestly against the evidence presented at trial and that the government failed to prove the essential elements of the counts against him.

His motion is supported by the affidavit of his counsel, Mr. Craig A. Washington, who states:

> On information and belief, having sat through the trial, the motion of [Bell] for post-judgment verdict of acquittal is well taken. The jury apparently was confused and unable to properly distinguish evidence that should have been attributed to BELL's conduct and apparently attributed the conduct of others to BELL in an inappropriate way, resulting in a belief, but not such a belief as to be a belief beyond a reasonable doubt that BELL was guilty of any of the counts charged against him in the superseding indictment.

Washington Aff. (doc. 299-2) (original emphasis).  Bell also argues that there was no evidence linking him to any of the codefendants except for Anderson, who testified but did not implicate him in any

way.  He contends that he is therefore entitled to acquittal on the conspiracy count.  With respect to the other counts, Bell argues that there was no testimony to show that he had any intent to defraud.

The government opposes Bell's motion and contends that the evidence supports the jury's verdict of guilty against him.  The evidence shows that Bell used a forged power of attorney that allowed for the sale of Cliffbrook and Cinderella.  Bell also signed false marital affidavits.  Bell received proceeds from several of the transactions.

The court has reviewed the parties' arguments, the evidence and record, and the applicable law.  It determines that Bell is not entitled to acquittal on the counts of conviction.  The evidence presented to the jury was sufficient to sustain its verdict.  While Defendant has submitted an affidavit from his counsel in support of his motion, the affidavit includes no reference to any specific evidence or basis to support the motion or that would tend to establish a finding of not guilty.  The affidavit is conclusory and reflects Mr. Washington's subjective belief and personal assessment of the evidence, a function that is exclusively reserved for the jury.  Accordingly, the court **denies** Bell's motions for acquittal.

### 7.    Andrews

Andrews made an oral motion for acquittal after the government rested.  He did not file a written motion, but the court ordered the government to file a written response to his oral motion.  The government filed its response on July 7, 2010.  Andrews argued generally that acquittal was proper pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure.

The government opposes Andrews's motion and contends that the evidence supports the jury's verdict of guilty against him.  It sets forth the evidence introduced at trial against him.  Andrews was

convicted of counts sixteen and seventeen, which relate to the Creek Bend and Appalachian transactions.

The court has reviewed the parties' arguments, the evidence and record, and the applicable law.  It determines that Andrews is not entitled to acquittal on the counts of conviction.  The evidence presented to the jury was sufficient to sustain the counts of conviction.  Accordingly, the court **denies** Andrew's motion for acquittal.

### 8.    Mason

Mason made both oral and written motions for acquittal after the government rested.  He also filed a motion for acquittal after the jury's verdict and moved in the alternative for a new trial.  Mason argues generally that the jury's verdict is manifestly against the evidence presented at trial and that the government failed to prove the essential elements of the counts against him.  He also argues that the only evidence of his involvement with any wire fraud or aiding or abetting is his agreement to act as a trustee of Prestige Capital Corporation.  Although he deposited a check for $5,000 from EFC Investments, he argues that there is no evidence that the money was connected to any property.  He argues further that there is no evidence he knew of any criminal venture.  Finally, he contends that the jury's not guilty verdict on the conspiracy count and guilty verdict on the substantive wire fraud charge are inconsistent and require acquittal on the counts of conviction.  He argues that this inconsistency proves that the jury was confused and did not follow the court's instructions.

The government opposes Mason's motion and contends that the evidence supports the jury's verdict of guilty against him.  It sets forth the evidence introduced at trial against him.  The government contends that Mason assisted Farrington with filing bogus deeds of trust on two properties, creating the false impression that there were second liens in favor of Prestige Capital that

were paid off by loan proceeds.  These properties did not require a TLDA, and loan proceeds were shown on the HUD-1 form as the payoff of a second mortgage and disbursed as such.  The deeds of trust were executed after sales contracts were signed but before closing.  Mason signed letters on Prestige Capital letterhead confirming the existence of the liens and stating the false payoff amounts.  The agent testified that Mason could not explain why he wrote the letters or transferred the deeds of trust from Farrington's name to his.  The government argues that this is an implausible explanation, which shows consciousness of guilt.  It argues that the jury could have believed that Mason had full knowledge of the fraudulent scheme, that he aided and abetted it, and that he had the intent to defraud.

With respect to Mason's argument about inconsistent verdicts, the government responds that this argument was rejected in *United States v. Scurlock*, 52 F.3d 531, 537-38 (5th Cir. 1995).  Mason does not cite any case law in support of this argument.  The court agrees with the government.  In *Scurlock*, the court clearly held that inconsistent verdicts do not require a court to acquit a defendant:

> A jury can render inconsistent verdicts, even where the inconsistency is the result of mistake or compromise.  And, contrary to the conclusions of the defendant, an acquittal on the conspiracy charge does not necessarily equate with a finding that the defendant was innocent.  The jury's verdict may have been motivated by other considerations.

*Id*. at 537 (citations, quotations, and footnotes omitted).  The court does not agree that the jury was confused and did not follow its instructions.  The jury deliberated for almost four days, and the split verdict shows that the jury took its responsibility seriously by carefully weighing and considering the evidence as to each count and each Defendant.  Further, other than argument or speculation, there is nothing to indicate that the jury disregarded the court's instructions.  Mason's arguments lack merit.

The court has carefully reviewed Mason's motions, the government's response, the record, and the applicable law.  It determines that he is not entitled to acquittal on the counts of conviction

or a new trial.  The evidence presented to the jury was sufficient to sustain the counts of conviction.

Mason has failed to show that the interests of justice require a new trial.  Accordingly, the court

**denies** Mason's motions for acquittal and for a new trial.

## IV.     Conclusion

The court has carefully reviewed the parties' arguments, the evidence, and the applicable law.

It has considered all the evidence, both circumstantial and direct, and all inferences that the jury could

have reasonably drawn from the presentation of the evidence.  The court by no means cited all of the

evidence presented in this case.  There is other key evidence, direct and circumstantial, that the jury

could have relied on in rendering the guilty verdicts.  The jury deliberated for almost four days.

While the presentation of evidence was not as clear as it could have been, the evidence was there for

the jury to put the pieces of puzzle together where they fit.  When the pieces did not fit, the jury

returned "not guilty" verdicts.  The court believes that the jury was conscientious and deliberate and

that it considered the evidence carefully and followed its instructions.  The court concludes that a

reasonable juror could have found beyond a reasonable doubt that each Defendant was guilty of the

counts for which he or she was found guilty.

For the foregoing reasons, the court **denies** Defendant Robert John Mason's Motion for a

Judgment of Acquittal After the Prosecution has Rested its Case in Chief; **denies** Defendant Edwin

Terrence Bell's Motion for Post-Verdict Judgment of Acquittal; **denies** Defendant James Edward

Jones's Motion for Post-Verdict Judgment of Acquittal; **grants** Defendant Kevin Ray Sanderson's

Request for Ruling on Motion for Acquittal Pursuant to Rule 29 Following the Close of the

Government's Evidence to the extent it rules on the motion and **denies** his Motion for Acquittal

Pursuant to Rule 29 Following the Close of the Government's Evidence, Motion for Acquittal

Pursuant to Rule 29 Following Jury Verdict, and Motion for New Trial Pursuant to Rule 33; **grants** Defendant Janice Shepherd's Request for Ruling on Motion for Acquittal Pursuant to Rule 29 Following the Close of the Government's Evidence to the extent it rules on the motion and **denies** her Motion for Acquittal Pursuant to Rule 29 Following the Close of the Government's Evidence, Motion for Acquittal Pursuant to Rule 29 Following Jury Verdict, and Motion for New Trial Pursuant to Rule 33; **denies** Defendant Rejis Lamont Williams's Motion for Post-Verdict Judgment of Acquittal; **denies as moot** Defendant Rejis Lamont Williams's Motion for Post-Verdict Judgment of Acquittal; and **denies** Defendant Robert John Mason's Motion for Post-Verdict Judgment of Acquittal and Alternative Motion for New Trial.  The court **denies** the oral motions for acquittal made on March 23, 2010, after the government rested and closed its case.

       **It is so ordered** this 16th day of July, 2010.


*Sam A. Lindsay*

Sam A. Lindsay
United States District Judge